# EXHIBIT 1

Case 1:24-cv-01278-BAH    Document 1-2    Filed 05/01/24    Page 2 of 38    eFiled
01/31/2024 8:41:31 AM
Superior Court
of the District of Columbia

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **DISTRICT OF COLUMBIA,**<br>a municipal corporation,<br>400 6th Street, N.W.<br>Washington, D.C. 20001,<br><br>Plaintiff,<br><br>v.<br><br>**UDR, Inc.**<br>1745 Shea Center Dr, STE 200,<br>Highlands Ranch, Colorado, 80129<br><br>Serve On:<br>CT CORPORATION SYSTEM,<br>1015 15th St NW, Suite 1000<br>Washington, District of Columbia, 20005<br><br>Defendant. | Case No.:    2024-CAB-000635 |

### COMPLAINT

The District of Columbia (the District) brings this action against UDR, Inc. (UDR), a District property manager, for creating a hostile housing environment for Black female tenants in violation of the District of Columbia Human Rights Act (DCHRA), D.C. Code §§ 2-1401.01, *et seq.*, and the Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq.*

In support of its claims, the District states as follows:

### **INTRODUCTION**

1.      UDR knowingly allowed a male tenant, Gueorgui Iskrenov (Iskrenov), to engage in a months-long targeted campaign of race- and sex-based harassment against Black female tenants at Waterside Towers Apartments (Waterside Towers), the building they called home.

2.      At different times in 2020, two Black female tenants at Waterside Towers, Ms. G. and Ms. M.,[1] independently notified UDR that Iskrenov was committing acts of physical violence against them, was threatening them with physical violence, and was hurling racist and sexist epithets at them. In response, UDR sat idle. It permitted the harassment to continue unabated for months, even when it became so severe that Iskrenov was charged with and ultimately convicted of a hate crime for his behavior.

3.      UDR's knowing failure to address Iskrenov's race- and sex-based misconduct created a hostile housing environment for Black female tenants at Waterside Towers, including but not limited to Ms. G. and Ms. M.

4.      By creating a hostile housing environment for Black female tenants at Waterside Towers, UDR altered and impaired the living conditions of those tenants, restricted their access to services and facilities, and interfered with their enjoyment of their homes because of their race and sex. UDR thus violated both the DCHRA, which protects tenants from race- and sex-based discrimination, and the CPPA, which protects tenants from unfair and deceptive housing practices.

5.      To remedy UDR's unlawful conduct, the District seeks a declaration that UDR violated the DCHRA and the CPPA, an injunction prohibiting UDR from violating the DCHRA and the CPPA, restitution and damages for UDR's victims, civil penalties payable to the District, and the District's reasonable attorneys' fees and costs.

## PARTIES

6.      Plaintiff District of Columbia, a municipal corporation, is the local government for the territory constituting the permanent seat of the government of the United States. The District is represented by and through its chief legal officer, the Attorney General for the District of

---

[1] Due to the sensitive nature of the events contained herein, the District is anonymizing the identity of the identified victims for the purposes of this Complaint.

Columbia. Under D.C. Code § 1-301.81(a)(1), the Attorney General conducts the District's legal business and is responsible for upholding the public interest. Under D.C. Code §§ 2-1403.16a and 28-3909, the Attorney General is expressly authorized to enforce the District's anti-discrimination and consumer protection laws.

7.     UDR is a corporation whose principal place of business is 1745 Shea Center Dr., STE 200, Highlands Ranch, Colorado, 80129. UDR manages multiple apartment complexes in the District of Columbia, including Waterside Towers, located at 907 6th Street S.W., Washington, D.C., 20024.

## JURISDICTION

8.     The Attorney General for the District of Columbia brings this action on behalf of the District of Columbia to uphold the public interest and enforce District law, including the DCHRA and CPPA, under D.C. Code §§ 2-1403.16a and 28-3909.

9.     The Attorney General for the District of Columbia also brings this action on behalf of Ms. G. and Ms. M. under D.C. Code § 2-1403.05(f)-(g).

10.    This Court has subject matter jurisdiction over this case pursuant to D.C. Code § 11-921(a).

11.    This Court has personal jurisdiction over defendant UDR pursuant to D.C. Code § 13-423 because UDR transacts business in the District.

## PROCEDURAL HISTORY

12.    Mses. G. and M. each filed a housing discrimination complaint with the District of Columbia Office of Human Rights (OHR) on February 8, 2021. These complaints alleged that UDR, as their housing provider, subjected them to intimidation and harassment based on their race (Black) and sex (female).

13.     On June 28, 2022, OHR issued Letters of Determination finding probable cause that UDR had discriminated against Ms. G. and M. based on their race and sex by subjecting them to a hostile housing environment for failing to prevent another tenant from intimidating and harassing them on the basis of their race (Black) and sex (female) after they repeatedly reported this intimidation and harassment to UDR and its staff members.

14.     On July 8, 2022, UDR elected that both complaints be adjudicated in Superior Court pursuant to D.C. Code § 2-1403.05(f).

15.     On July 21, 2022, OHR referred the matters to the Office of the Attorney General pursuant to D.C. Code § 2-1403.05(g). Thereafter, the Attorney General's attempts to resolve the complaints between UDR and the complainants were unsuccessful.

## FACTS

### Ms. M.

16.     In or around April 2020, Ms. M., a Black woman, signed a lease with UDR and moved into her new home at Waterside Towers.

17.     On April 20, 2020, Ms. M. was in the building's elevator with another tenant, Gueorgui Iskrenov (Iskrenov), a white male, and his pit bull. Ms. M. was uncomfortable being in the elevator with Iskrenov, who was not wearing a mask in the confined space of the elevator despite the onset of the COVID-19 pandemic. After Iskrenov's dog jumped on Ms. M., she tried to exit the elevator but was blocked by Iskrenov. Ms. M. had to force Iskrenov to let her off the elevator, after which Iskrenov called her a "Black b***h," a "n****r c**t," and a "Black lives matter n****r" as she was exiting the elevator.

18.     On April 23, 2020, Ms. M. emailed a UDR employee to report this incident, identifying Iskrenov by his dog and relaying that he had trapped her in the elevator and called her

a racial slur. Ms. M. requested that UDR advise all tenants to not verbally assault their neighbors. A few days after sending her April 23, 2020 email, Ms. M. asked the UDR employee she had emailed if they had received the email, to which the employee responded that they would "get around to it."

19.    However, UDR failed to protect Ms. M. or to send any notice to tenants not to verbally assault their neighbors. On June 7, 2020, as Ms. M. was reporting another incident of racial harassment by Iskrenov to a UDR employee working the building's front desk, Iskrenov and Ms. M. had yet another encounter in front of the UDR employee. This incident escalated, leading to Ms. M. calling the police.

20.    Despite the confrontation occurring in front of a UDR employee, no one from UDR intervened, nor did UDR follow-up with Ms. M. after the June 7, 2020 incident or do anything to prevent Ms. M. from being subjected to additional racist slurs and sex-based harassment.

21.    On July 2, 2020, Ms. M. was exiting Waterside Tower's parking garage when she encountered Iskrenov, who swung a metal door at her, striking her in the arm. Iskrenov then pushed past Ms. M., again calling her a "b***h", "n****r", and a "c**t" as he walked by.

22.    Just days later, on July 7, 2020, Iskrenov drove past Ms. M. in the building's parking garage and made a gun with his hand, pointing it at Ms. M. as he drove by.

23.    The following day, July 8, 2020, Ms. M. again emailed UDR—this time, multiple members of management—to summarize Iskrenov's persistent race- and sex-based harassment, including him calling her a "b***h n****r" and his threat from the day before. In her email, Ms. M. identified Iskrenov as a tenant and stated that she was becoming very concerned about encountering him because of his pattern of harassing her and other Black female tenants.

24.    In her July 8, 2020 email, Ms. M. further informed UDR that another tenant had approached her after Iskrenov called that tenant and her daughter, both Black women, "Popeye's chicken eating N****r."

25.    UDR's community director responded to Ms. M. that same day, stating that he wanted to set up a time to meet with Ms. M. to discuss her email.

26.    On July 9, 2020, Ms. M. replied to the community director's email, stating that she was available to meet several times that week. UDR's community director replied seven days later, on July 16, 2020, asking to delay their meeting by another week.

27.    Having heard nothing more from UDR, on July 30, 2020, Ms. M. provided UDR with the name and the apartment number of Iskrenov, information she was forced to obtain without UDR's assistance. Ms. M. also reiterated her earlier encounters with Iskrenov, stating that on several occasions, Iskrenov had threatened her and followed her out of the building while engaging in racist rants. Ms. M.'s email warned that UDR's lack of attention to the matter had given Iskrenov the green light to continue harassing Ms. M.

28.    On August 4, 2020, UDR's attorney replied to Ms. M.'s July 30, 2020 email and instructed that she direct all future correspondence to him. UDR's attorney claimed he could not comment directly on UDR's interactions with other tenants, stating only that UDR planned to enforce its leases to the full extent of the law.

29.    On August 18, 2020, Ms. M. reported to UDR yet another encounter with Iskrenov in the building's elevator, which occurred on August 14. She *again* reiterated that Iskrenov had been harassing her for months and often used his dog to threaten her, as she reported he had done on August 14. The following day, UDR's attorney replied, stating only that a UDR employee

provided a different account from Ms. M. of the August 14 incident. UDR provided no additional assistance.

30.    UDR made no further efforts to address Ms. M.'s fears.

31.    On October 7, 2020, Iskrenov voluntarily moved out of the apartment complex.

**Ms. G.**

32.    On July 20, 2020, Iskrenov began a pattern of harassment and intimidation directed at another Black female resident of Waterside Towers, Ms. G. Ms. G. had lived at Waterside Towers since October 2018.

33.    In the building's parking garage, Iskrenov almost struck Ms. G. with his car when he accelerated towards her while she was crossing in a pedestrian crosswalk.

34.    Iskrenov then rolled his window down and yelled racist slurs at Ms. G. before spitting in her face—during the height of the Covid-19 pandemic—and threatening her.

35.    That same day—July 20, 2020—Ms. G. verbally reported the incident to a UDR employee as well as the police.

36.    On July 30, 2020, having received no response from UDR, Ms. G. emailed four members of UDR's management staff and described the July 20, 2020 incident with Iskrenov, informing them that Iskrenov referred to her as "n****r b***h, black b***h, fat b***h, ugly b***h; told [her] to shut the f**k up, threatened to f**k [her] up". She also provided Iskrenov's name and identified his vehicle to UDR.

37.    On August 4, 2020, UDR's attorney emailed Ms. G. and instructed that she direct all future correspondence regarding the July 20, 2020 incident to him.

38.    On August 12, 2020, Iskrenov was arrested as a result of the July 20, 2020 incident with Ms. G., due to her police complaint. On August 13, 2020, the United States Attorney's Office for the District of Columbia filed a simple assault charge against Iskrenov based on that incident. That same day, the Superior Court of the District of Columbia, Criminal Division issued a Stay Away / No Contact Order, ordering Iskrenov to engage in "no assaultive, abusive, harassing, or stalking behavior" toward Ms. G.

39.    Despite this order, Iskrenov again harassed Ms. G. on August 15, 2020. While Ms. G. was standing outside of Waterside Towers having a conversation with another neighbor, Iskrenov walked out of the building and approached her. Iskrenov then stood directly in front of her and glared at her, pacing back and forth in front of her several times.

40.    Ms. G. emailed UDR's attorney about his ongoing harassment on August 18, 2020. Ms. G. also reported the August 15 incident to her representative from the Equal Rights Center, who in turn immediately relayed both the July 20 and August 15 encounter in an August 27, 2020 email to UDR's attorney.

41.    Ms. G.'s representative from the Equal Rights Center asked UDR to take immediate steps to address Mr. Iskrenov's harassment by investigating her allegations, as well as any other allegations from other residents against Iskrenov, and transferring Ms. G. to a comparable two-bedroom unit so that Iskrenov did not know where she lived.

42.    UDR still took no action against Iskrenov, even after the assault which led to his arrest and after Ms. G. notified them that he had violated his subsequent Stay Away / No Contact Order.

43.    UDR's inaction was particularly egregious in light of the crime-free housing addendum in its Waterside Towers leases, which established that criminal activity, even absent a

criminal conviction, was a material violation of the lease and good cause for the termination of a tenancy.

44.    Ms. G. reiterated the request to be transferred to a comparable unit in an email she sent to UDR's attorney on September 2, 2020. In this email, she informed UDR that she wanted to transfer units as soon as possible because she was constantly scared for her safety and wellbeing in her home, as she knew Iskrenov knew where she lived. She described to UDR how this fear had inflicted severe emotional and physical distress, often manifesting as insomnia.

45.    Despite Ms. G. informing UDR of the severe adverse impact Iskrenov's conduct was having on her, UDR failed to offer Ms. G. an alternate apartment comparable to the unit she was then renting.

46.    On February 1, 2023, Iskrenov was convicted of committing a hate crime based on his July 20, 2020 assault of Ms. G.

***

47.    Over the course of multiple months, UDR was repeatedly put on notice that Iskrenov was subjecting Black women at Waterside Towers to severe, pervasive, targeted harassment. Time and again, UDR failed to act.

48.    UDR's failure to counsel, discipline, or evict Iskrenov, or take any other action to address his intimidating and harassing behavior or remedy the fear it was intended to spawn, denied UDR's Black female tenants use and enjoyment of their homes equal to that of UDR's non-Black and non-female tenants.

**CAUSES OF ACTION**

**COUNT I**
**VIOLATIONS OF DCHRA'S PROHIBITION**
**AGAINST HOUSING DISCRIMINATION**
**(D.C. CODE § 2–1402.21(a))**

49.    All prior paragraphs in the Complaint are repeated and incorporated here.

50.    The DCHRA is intended "to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, [… or] sex…" D.C. Code § 2–1401.01.

51.    D.C. Code § 2–1402.21(a) makes it an unlawful discriminatory housing practice to do any of the following "wholly or partially for a discriminatory reason based on the actual or perceived:  race [… or] sex" of a person:

a. "refuse or restrict facilities [or] services … for a tenant;"

b. "require different terms" for any transaction in real property; or

c. "include in the terms or conditions of a transaction in real property, any clause, condition or restriction."

52.    A hostile housing environment exists when an individual is subjected to unwelcome conduct based on a protected trait which is sufficiently severe or pervasive as to interfere with the use or enjoyment of a dwelling.

53.    Subjecting a tenant to a hostile housing environment on the basis of race and sex restricts the tenant's ability to access building facilities, common areas, amenities, and their own units based on those traits, and thus discriminates against the tenant based on those traits.

54.    Subjecting a tenant to a hostile housing environment on the basis of race and sex includes a refusal to provide the tenant services required for the tenant's safety based on those traits, and thus discriminates against the tenant based on those traits.

10

55.     Subjecting a tenant to a hostile housing environment on the basis of race and sex subjects the tenant to different terms or conditions in a real estate transaction based on those traits, as compared to tenants not subjected to a hostile housing environment based on those traits, and thus discriminates against the tenant based on those traits.

56.     By failing to take any action to address repeated complaints of Izkrenov's race- and sex-based intimidation and harassment, UDR subjected Black women residing at Waterside Towers, including but not limited to Ms. M. and Ms. G., to a hostile housing environment on the basis of race and sex, and thus discriminated against them in violation of D.C. Code § 2–1402.21(a). Specifically, UDR's inaction created a hostile housing environment at Waterside Towers based on race and sex by restricting the access of Black female tenants to facilities and services in the building, denying Black female tenants the services necessary to keep them safe and secure in their homes, and subjecting Black female tenants to different terms and conditions in their housing as compared to non-Black, non-female tenants.

## COUNT II
## INTERFERENCE WITH RIGHTS PROTECTED BY THE DCHRA
### (D.C. CODE § 2–1402.61)

57.     All prior paragraphs in the Complaint are repeated and incorporated here.

58.     D.C. Code § 2–1402.61 makes it unlawful to "interfere with any person in the exercise or enjoyment of … any right granted or protected under this chapter."

59.     The rights that D.C. Code § 2–1402.61 shields from interference include the right protected by D.C. Code § 2–1402.01, which guarantees that "[e]very individual *shall* have an equal opportunity to participate fully in the economic, cultural and intellectual life of the District and to have an equal opportunity to participate in all aspects of life, including, […] housing." (Emphasis added.)

60.    The rights that D.C. Code § 2–1402.61 shields from interference also include all other rights in Chapter 14, including but not limited to those guaranteed by D.C. Code § 2–1402.21(a).

61.    Subjecting Black women to a hostile housing environment based on their race and sex interferes with their exercise and enjoyment of these rights, in violation of D.C. Code § 2–1402.61.

62.    UDR violated D.C. Code § 2–1402.61 because it subjected Black women, including but not limited to Ms. M. and Ms. G., to a hostile housing environment that interfered with the exercise and enjoyment of their protected rights that D.C. Code §§ 2–1402.02 and 2–1402.21(a) guarantee.

**COUNT III**
**VIOLATIONS OF THE CONSUMER PROTECTION PROCEDURES ACT**
**(D.C. CODE § 28–3904)**

63.    All prior paragraphs in the Complaint are repeated and incorporated here.

64.    The CPPA prohibits merchants from engaging in unfair or deceptive trade practices in connection with a transaction for consumer goods or services. D.C. Code § 28–3904.

65.    The rental housing that UDR offers is for personal, household or family purposes and, therefore, is a consumer good or service. D.C. Code § 28–3901(a)(7).

66.    UDR, in the ordinary course of business, supplies consumer goods or services— namely apartment rentals—and therefore is a "merchant" under the CPPA. D.C. Code § 28–3901(a)(3).

67.    District residents or other individuals who sought to rent UDR's housing properties are "consumers" under the CPPA because they are persons who "would [] lease [] consumer goods," such as the housing properties rented by UDR. D.C. Code § 28–3901(a)(2).

68.     Under D.C. Code § 28–3904, it is an unlawful trade practice for any person (1) to represent that goods or services have a particular standard, quality, grade, style or model, if in fact they are of another; (2) to misrepresent as to material fact which has a tendency to mislead; and (3) fail to state a material fact if such failure tends to mislead.

69.     UDR committed unfair or deceptive trade practices under the CPPA when, among other acts, UDR:

a.     Implicitly represented to tenants, through offering and entering into leases and other acts, that it would abide by the warranty of quiet enjoyment when, in fact, it violated this warranty by failing to stop Iskrenov from interfering with the right of Black female tenants to possess, inhabit, and peacefully enjoy their property, even after Ms. M and Ms. G. requested that UDR take action.

b.     Implicitly represented to tenants, through offering and entering into leases and other acts, that it would abide by the duty of protection when, in fact, UDR violated this duty by failing to protect its Black female tenants from the foreseeable risk of harassment, threats and assault by Iskrenov on its property, even though it was provided notice of this risk.

c.     Collected rent from Black female tenants while failing to inform them that it would continuously and systematically fail to meet its obligations under applicable law as a housing provider.

70.     UDR's misrepresentations and omissions of material fact had the tendency to mislead consumers and thus were unfair and deceptive trade practices in violation of the CPPA, D.C. Code § 28–3904(d), (e) & (f).

71.     Under the CPPA, a violation of other District laws in the course of a consumer transaction is also an unfair or deceptive trade practice. D.C. Code § 28–3904.

72.     By engaging in trade practices that violate the DCHRA, as described above, UDR has engaged in unlawful, unfair, and deceptive practices affecting District consumers, in violation of the CPPA. D.C. Code § 28–3904.

**PRAYER FOR RELIEF**

WHEREFORE, the District requests that this Court enter judgment in its favor and grant relief against UDR as follows:

a.     Declaratory relief, including but not limited to declarations that UDR violated the DCHRA and CPPA;

b.     Injunctive relief, including but not limited to permanent injunctions prohibiting UDR from engaging in conduct that violates the DCHRA and CPPA, and from permitting a hostile housing environment in buildings UDR owns or manages in the District;

c.     Equitable relief, including but not limited to requiring that UDR take actions to ensure ongoing compliance with the DCHRA and CPPA;

d.     Restitution and damages to all tenants harmed by UDR's violations of the DCHRA and CPPA;

e.     Civil penalties for violations of the DCHRA and CPPA;

f.     The District's reasonable attorneys' fees and costs; and

g.     Such other and further relief as this Court deems appropriate based on the facts and applicable law.

**JURY DEMAND**

The District of Columbia demands a jury trial.

Dated:  January 31, 2024                Respectfully submitted,

                                        BRIAN L. SCHWALB
                                        Attorney General for the District of Columbia

                                        JENNIFER C. JONES
                                        Deputy Attorney General
                                        Public Advocacy Division

                                        */s/ Alicia M. Lendon*
                                        ALICIA M. LENDON [1765057]
                                        Chief, Civil Rights & Elder Justice Section
                                        Public Advocacy Division

                                        */s/ Griffin Simpson*
                                        GRIFFIN SIMPSON [1753943]
                                        JESSICA E. FEINBERG [1779644]
                                        Assistant Attorneys General
                                        400 Sixth Street, N.W., Suite 10100
                                        Washington, D.C. 20001
                                        (202) 227-5364
                                        Griffin.Simpson1@dc.gov

                                        *Attorneys for the District of Columbia*

eFiled
4/1/2024 2:30:17 PM
Superior Court
of the District of Columbia

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

### Civil Division

| | |
|---|---|
| **DISTRICT OF COLUMBIA,**<br><br>        Plaintiff<br><br>**v.**<br><br>**UDR, Inc.,**<br><br>        Defendant. | Civ. No. 2024-CAB-000635<br><br>Judge Maurice Ross |

### COMPLAINT AND JURY DEMAND

### NATURE OF THE ACTION

1.  Ms. G. and Ms. M. (collectively "Intervenor-Plaintiffs"), both Black women, bring this civil rights action against UDR, Inc. ("UDR") for unlawfully violating their rights under the Fair Housing Act of 1968 ("FHA"), *as amended*, 42 U.S.C. §§ 3601 *et seq.*, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.21 *et seq.*, by creating a hostile housing environment. Specifically, Intervenor-Plaintiffs allege that UDR knowingly failed to take prompt and appropriate action to correct and end race- and sex-based harassment at one of its residential rental properties.

2.  Defendant UDR, a real estate management company that owns, operates, and manages Waterside Towers, failed for months to address complaints made by Intervenor-Plaintiffs about racially and sexually abusive conduct directed at them by Gueorgui Iskrenov, another tenant at Waterside Towers. UDR failed to take actions that were within its control to stop the harassment.

3.  From April 2020 through to the abuser's voluntary departure in October 2020, Intervenor-Plaintiffs were subject to a sustained and escalating campaign of intimidation and harassment because of their race and sex.

4.     Both Ms. M and Ms. G, independent of each other, were subject to racist and sexist abuse at Iskrenov's hands, and both independently reported to UDR that they were physically and emotionally harassed by Iskrenov in violation of local law, federal law, and the Waterside lease and its addenda.[1]

5.     Despite lease terms and laws that both required and empowered UDR to act – and despite repeated entreaties from not just Intervenor-Plaintiffs but other Black women in the complex – UDR took no action, instead allowing the abuser to remain in his unit and thus to remain a threat to Intervenor-Plaintiffs.

6.     From the very first instance, UDR was on notice of the harassment. Despite reports from UDR employees who witnessed the harassment, multiple police reports, and a slew of formal complaints from Intervenor-Plaintiffs, UDR took no action.

7.     By failing to take immediate and appropriate action to stop Iskrenov's behavior, UDR violated Intervenor-Plaintiffs' rights to be free from discrimination on the basis of race and sex and caused them to be subjected to a hostile housing environment. UDR's actions also altered and impaired the living conditions of Intervenor-Plaintiffs, restricted their access to services and facilities, and interfered with their enjoyment of their homes on the basis of race and sex. UDR's actions and representations also materially misled Intervenor-Plaintiffs about their leases, the quality and security of their units, and on UDR's willingness to uphold its obligations to protect its tenants.

---

[1] Any cited portion of the lease agreement is appended hereto as Attachment 1.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over this matter pursuant to D.C. Code §
11-921(a).

9.    This Court has personal jurisdiction over Defendant UDR pursuant to D.C. Code
§ 13-423 because UDR transacts business in the District of Columbia.

## PARTIES

10.    Intervenor-Plaintiff Ms. G is a Black woman with a disability who began living in
Waterside Towers in October 2018. As of the time of filing, she still resides there.

11.    Intervenor-Plaintiff Ms. M is a Black woman who began living in Waterside
Towers in April 2020. She left her unit voluntarily in May 2021.

12.    Defendant UDR, Inc. ("UDR") is a corporation headquartered in Highlands Ranch,
Colorado, organized and existing under the laws of Maryland, and doing business in Washington,
D.C. UDR is a residential apartment manager and owner that owns and manages Waterside Towers
located at 907 6th Street SW in Washington, D.C. The events complained of all occurred at
Waterside Towers while UDR owned and managed it.

13.    In acting or omitting to act as alleged herein, Defendant UDR was acting through
its employees and/or agents and is liable based on the acts and omissions of their employees and/or
agents.

14.    In acting or omitting to act as alleged herein, each employee or officer of UDR was
acting within the course and scope of their actual or apparent authority pursuant to such agencies,
or the alleged acts or omissions of each employee or officer was subsequently ratified and adopted
by UDR as principal.

## FACTUAL BACKGROUND

### Ms. M

15.    Ms. M signed a lease with UDR and moved into Waterside Towers in April 2020. Ms. M moved to downsize because of the economic tumult caused by the COVID-19 pandemic.

16.    The lease agreement UDR entered into with Ms. M at the time of her rental included obligations for both UDR and its tenants to comply with written apartment rules and community policies. This lease was operative for the full period of her tenancy at Waterside.

17.    UDR's lease also conditioned access to amenities on compliance with a rule against "loud, boisterous, objectionable or damaging behavior" and identified "Prohibited Conduct" as any "loud [or] obnoxious behavior" that "disturb[s] or threaten[s] the rights, comfort, health, safety, or convenience of others . . . in or near the apartment community. Lease, Section 16, 17. It also explicitly barred "engaging in or threatening violence." *Id*.

18.    The lease also included a "crime-free addendum" prohibiting tenants from "engaging in any illegal or criminal activity on or about the premises," including engaging in any activity that "jeopardizes the health, safety, and welfare" of other tenants. Crime/Drug Free Housing Addendum, 4.A, ¶¶ 3, 4, 5 and 7.

19.    Violation of any of these provisions constituted grounds for terminating the lease. *Id*.

20.    On April 20, 2020, shortly after she moved in, Ms. M encountered Iskrenov in the elevators. Conscious of the COVID-19 protocols and masking requirements and dealing with various co-morbidities, Ms. M was shocked to see Iskrenov in the elevator visibly sick and without a mask.

21.     To protect herself, Ms. M attempted to get off the elevator on a lower floor than her own to reduce the time she spent around Iskrenov. As she moved to leave, Iskrenov's dog – a large and aggressive Cane Corso – leapt on her, scaring her. Iskrenov did nothing to restrain the dog.

22.     Instead, Iskrenov began to insult Ms. M in explicitly racial and gendered terms. He called her a "black b***h," a "Black Lives Matter n****r," and a "n****r c**t."

23.     Ms. M was both scared and outraged by Iskrenov's blatantly racist and sexist outburst. She reported the incident to UDR on April 23, 2020 via email, specifically asking that UDR remind other tenants to respect their neighbors, control their pets, and more vigorously enforce the building's COVID policies.

24.     UDR did not respond to Ms. M's email or take action to enforce the terms of the lease.

25.     A few days later, Ms. M followed up in-person to see what UDR was doing about the incident. The Leasing Consultant she spoke to downplayed the incident and its significance, and disregarded the possible harm that Ms. M could suffer were she to get ill. When Ms. M pressed her for some kind of action, she waved her away, saying that she would "get around to it." She never did.

26.     Between the time that Ms. M first reported the incident and the next instance where Iskrenov verbally assaulted her, UDR did not issue a notice to the tenants putting them on notice that they could not verbally assault other tenants, it did not attempt to investigate Ms. M's report to find out who harassed her. In fact, UDR took no action to prevent this kind of abuse from happening again.

27.     Despite the reported incidents being clear violations of the lease, UDR did not act to enforce the lease or exercise its clear authority to sanction or remove Iskrenov.

28.     On June 7, 2020, Ms. M again complained to a UDR employee about Iskrenov's continued abuse, which had persisted since her first report.

29.     Ms. M notified the UDR employee that Iskrenov called her a "black nappy head," amongst other racialized and gendered insults. Iskrenov, in apparent retaliation against Ms. M for reporting him, then approached the front desk as Ms. M was reporting the incident and began verbally assaulting her. The interaction escalated and Ms. M called the police.

30.     The employee filed an incident report, directly identifying Iskrenov as the aggressor and noting that "things [e]scalated out of control."

31.     Even though a UDR employee witnessed the sexist and racist abuse Ms. M suffered and formally reported the misconduct, UDR still did nothing to stop the abuse or to enforce the applicable lease provisions against Iskrenov.

32.     At this point, UDR was fully on notice of Iskrenov's pattern of racist and violent behavior. It knew Iskrenov's identity and that the police had gotten involved. UDR knew that Iskrenov was targeting Ms. M because of her race and sex. Still, UDR did nothing.

33.     Facing no repercussions for his actions, Iskrenov's harassment escalated to physical violence. On July 2, 2020, Iskrenov hit Ms. M with the door in the building parking garage. He then called her a "b***h," a "n****r," and a "c**t."

34.     On July 7, 2020, Ms. M again encountered Iskrenov in the building's garage. He was driving his car out of the garage when, seeing Ms. M, he swerved toward her and almost hit her. As he pulled past her, he made a finger gun and pointed it at Ms. M, again threatening her with physical violence.

35.     The next day – July 8 – Ms. M again reported the incidents to UDR, noting that Iskrenov had physically assaulted her, had attempted to hit her with his car, and had threatened to shoot her.

36.     She also relayed other reports she had gotten from scared neighbors who were also subjected to Iskrenov's racist and sexist abuse. For example, Iskrenov called a teenage Black girl in the building a "Popeyes chicken eating n****r," and threatened her and her mother. She concluded by saying that she was concerned for her safety and the safety of the other Black women tenants who had been subject to Iskrenov's harassment but were "afraid to speak out of fear."

37.     Finally, after months of ignoring Ms. M's reports, the building's Community Director suggested a meeting with Ms. M. But it never happened: When Ms. M responded the next day to offer potential meeting times that week, the Community Director did not respond. The Community Director did not email again until July 16, when he postponed the meeting with Ms. M indefinitely.

38.     On July 30, after weeks of silence from UDR, Ms. M again reached out to UDR with Iskrenov's identity and apartment information, having worked with Ms. G to confirm it. The Intervenor-Plaintiffs did not know that UDR already knew that it was Iskrenov who was attacking them.

39.     In the July 30 email, Ms. M restated her concerns about Iskrenov.

40.     On August 4, UDR's attorney replied to Ms. M's July 30 email, instructing her to direct all future correspondence to him. Even as UDR engaged its counsel to protect itself, it did nothing to abate Iskrenov's abuse or protect Ms. M, Ms. G, or any of the other Black women at Waterside from Iskrenov's harassment.

41.    On August 14, Ms. M was again harassed by Iskrenov in the building elevator. In this incident, as before, Iskrenov permitted his large dog to lunge at her, which forced her back into the elevator in fear. She reported this to UDR on August 18, reiterating her frustrations and concerns about Iskrenov.

42.    As with the June 7 incident, a UDR employee witnessed Iskrenov's harassment, and reported it to UDR.

43.    UDR's attorney responded to say that her account of the interaction differed from that of a UDR employee but took no action to rectify the clear pattern of abuse. The attorney never notified Ms. M of any action taken by UDR to stop the harassment, and none was taken.

44.    Iskrenov and UDR's actions caused Ms. M to suffer severe emotional, economic, and reputational harms, including anxiety and fear. She was forced to move out of Waterside earlier than planned because of UDR's conduct and spent thousands of dollars to secure emergency housing.

45.    Ms. M continues to grapple with the humiliation and pain caused by UDR, and the trauma of having been harassed and abused for months still weighs on her.

## **Ms. G**

46.    Ms. G began living in Waterside Towers in October of 2018. As a person living with disabilities, she had previously sought accommodations from UDR.

47.    Ms. G is known to neighbors and staff as friendly, community-oriented, and generally non-confrontational. Some residents have referred to her as the "mayor of Waterside."

48.    On July 20, 2020, Ms. G was walking her dog outside the garage. Iskrenov accelerated his car at her, like he had with Ms. M, almost hitting her. As he pulled up next to her,

Ms. G asked that he slow down. In response, he called her a "n****r" and a "b***h." He told her to take "her gorilla a** back to Africa," and threatened to "f**k [her] up."

49.    He then spit on her, getting spit on her hair and face. He did this at the height of the COVID-19 pandemic.

50.    Ms. G was terrified by the encounter. That same day – July 20, 2020 – she reported the incident to UDR and to the police.

51.    Three other people, including Ms. M, witnessed the encounter and immediately reported it to UDR. The UDR employee prepared a written report about the incident based on the information supplied by Ms. G, who had taken notice of his car and license plate.

52.    This marked at least the third report made to UDR about Iskrenov's severe and pervasive harassment of Black women at Waterside. UDR had been aware for months of Iskrenov's terror. Still, it did nothing.

53.    With no indication that UDR was doing anything about Iskrenov's abuse and harassment, Ms. G investigated on her own. Her investigation led her to Ms. M, who had not only witnessed the incident but had herself been talking to other residents about Iskrenov's attacks.

54.    By July 30, the Intervenor-Plaintiffs had identified Iskrenov and notified UDR of his identity. The two detailed the attacks on themselves and other Black women in the complex, showing the full extent of Iskrenov's behavior. UDR still did nothing.

55.    In this same July 30, 2020 email, Ms. G noted that she was fearful that she was "going to leave this property seriously wounded or dead[.]" She also noted that UDR "could [sic] care less about" the numerous instances of Iskrenov accosting, assaulting, or otherwise harassing Black women in the building. This failure to rein in Iskrenov's behavior, she noted, "emboldened" him to escalate and continue his abuse.

56.     On August 4, Ms. G followed up with a UDR official, restating her concerns and noting that she had not heard back. Even with all the information provided from Intervenor-Plaintiffs, with the witness reports, and with staff writeups describing Iskrenov's abuse, UDR still did nothing.

57.     Because of UDR's silence and inaction, Mses. M and G continued to live in fear that they would be retaliated against by Iskrenov, who had already lashed out against Ms. M in June for reporting him to UDR.

58.     Faced with UDR's failure to protect her or any of the other Black women harassed by Iskrenov, Ms. G filed a police report on July 30, resulting in Iskrenov's arrest on August 12 and a stay-away order. Iskrenov also faced criminal charges.

59.     Iskrenov's actions violated the law, his lease, and the crime-free addendum that all Waterside residents have to sign. UDR knew of Iskrenov's behavior and had an obligation to act under both the law and its own lease provisions. UDR did nothing.

60.     On August 15, Iskrenov came up to Ms. G from across the property, stalking back and forth in front of her, in clear violation of the stay-away order. Iskrenov continued to attempt to intimidate Ms. G, following her to her floor and preventing her from going to the laundry room. She was forced to remain in her apartment until she was sure Iskrenov had departed. UDR's failure to enforce their lease or the law allowed Iskrenov to continue to flout the law, the lease, and the stay away order.

61.     Ms. G reached out to UDR on August 18, 2020, notifying them that Iskrenov was continuing to harass her. On August 26, 2020, a representative of Ms. G requested that UDR evict Iskrenov and move Ms. G to a new, comparable unit so that he would not know where she lived.

62.     The Equal Rights Center, also on behalf of Ms. G, reached out the next day demanding that UDR take corrective action to protect Ms. G. The requested measures included (1) investigating Ms. G's allegations and taking appropriate action; (2) transferring Ms. G to a comparable unit so that Iskrenov would not know where she lived; (3) investigating other complaints against Iskrenov and taking appropriate action on them.

63.     UDR and its attorney did not respond meaningfully for almost a month after the August 26 attorney email or the August 27 ERC email. In that time, there was no indication that it was taking any of the aforementioned corrective measures (or doing anything else to protect Ms. G or anyone else from Iskrenov).

64.     On September 14, 2020, UDR's attorney indicated that UDR would permit Ms. G to move to one of three other units, but none of the units were comparable. At least one of the units had mold, one had broken cabinets and doors, and one smelled of the nearby dumpster. Ms. G., through her representative at the Equal Rights Center, notified UDR that none of the units were suitable on September 17, 2020.

65.     UDR's conduct caused Ms. G to suffer anxiety, fear, and distress, and the emotional ramifications of UDR's inaction interfered with Ms. G's ability to function on a day-to-day basis.

66.     The fear and stress of being stalked by Iskrenov made Ms. G feel unsafe in her unit, and for months she could not sleep in it. She would instead stay with friends and neighbors, and oftentimes would not sleep at all.

67.     Ms. G was also too scared to be out and about at the property, fearful that Iskrenov would see her and continue to harass her (or worse). Because Ms. G was too scared to be out, neighbors had to walk her service dog for her.

68.     The emotional distress that the hostile housing environment caused Ms. G to experience remains ongoing.

## UDR's Failure to Act

69.     Upon information and belief, Iskrenov voluntarily vacated the premises on or around October 7, 2020. There is no indication that UDR sought or required his departure.

70.     Before Iskenrov vacated his unit, UDR received at least half a dozen reports of Iskrenov's misconduct from both residents and employees. These reports described Iskrenov's pattern of targeting Black women for verbal abuse, threats of physical violence, and actual assaults.

71.     UDR failed to respond to Iskrenov's behavior. UDR did not investigate the incidents, interview victims or witnesses, or admonish Iskrenov. There is no indication that UDR conducted any kind of investigation into the various allegations of harassment and misconduct by Iskrenov.

72.     After the first instance of harassment against Ms. M, she encouraged UDR to distribute an anti-harassment policy, or to notify the community that harassment against neighbors would not be tolerated. UDR did not do either.

73.     UDR was also encouraged to install video cameras in the garage to protect against incidents like the ones experienced by Ms. M and Ms. G. UDR did not do so.

74.     Additionally, UDR did not inform Iskrenov that it could or would enforce the lease provisions against him for his conduct.

75.     UDR did not permit Intervenor-Plaintiffs to move units for their own protection. While UDR did eventually offer Ms. G some sub-standard units, the obvious defects in these units rendered this offer hollow and meaningless.

76.     UDR did not restrict Iskrenov's access to communal areas.

77.     UDR did not terminate Iskrenov's lease, the terms of which he routinely violated.

78.     UDR did not even ask Iskrenov to stop harassing Ms. M, Ms. G, and other tenants.

79.     In the face of repeated and consistent reports of unlawful conduct by Iskrenov, UDR merely offered flimsy and vague assurances that the lease would be enforced, even though all of UDR's conduct indicated otherwise.

80.     UDR evicted other tenants to preserve safety during this same time period. In at least one instance, UDR moved within days to evict a tenant involved in a shooting, even absent any clear evidence that the tenant did anything wrong. In that situation, UDR acted after a single, ambiguous incident, but here it did nothing even after numerous incidents reported by several tenants.

81.     Even short of eviction, UDR failed to implement any of the other remedial tools at its disposal.

82.     UDR's total abdication of responsibility had the effect of ratifying Iskrenov's actions and permitting him to violate the lease and harass tenants in full view of UDR staff without consequence.

83.     This complete inaction fostered a hostile housing environment for UDR's Black and female tenants.

### Procedural History

84.     Mses. G and M both filed complaints with the District of Columbia Office of Human Rights (OHR) on February 8, 2021, alleging housing discrimination. OHR enforces a local ordinance in the District of Columbia that the Department of Housing and Urban Development has determined is substantially equivalent to the Fair Housing Act as authorized by 42 U.S.C. § 3616.

Intervenor-Plaintiffs alleged that UDR subjected them to intimidation and harassment based on their race and sex.

85.    OHR found that UDR had failed to take *any* action, let alone the prompt action to correct and end a discriminatory housing practice that the law demands.

86.    On February 1, 2023, Iskrenov was convicted of a hate crime based on his conduct toward Ms. G. *See* 2020 CMD 006323 (D.C. Super. Ct.); *see also* U.S. Att'ys Off., District of Columbia, "District Man Found Guilty of Bias-Related Assault on African-American Woman," at https://www.justice.gov/usao-dc/pr/district-man-found-guilty-bias-related-assault-african-american-woman. The United States said of Iskrenov's conviction, "[t]he government's evidence at trial showed that Iskrenov had a history of racist tirades against African American neighbors."

87.    Both Ms. M and Ms. G also filed complaints with the Department of Housing and Urban Development, both of which remain pending as of the date of this filing.

88.    The D.C. Office of the Attorney General filed a complaint in D.C. Superior Court on January 31, 2024 based on OHR's cause determination.

## CAUSES OF ACTION

### COUNT I
### Fair Housing Act (42 U.S.C. § 3604)

89.    Paragraphs 1 through 84 are realleged and incorporated by reference.

90.    A hostile housing environment exists when an individual is subjected to unwelcome conduct based on a protected trait which is sufficiently severe or pervasive as to interfere with the use or enjoyment of a dwelling.

91.    Subjecting a tenant to a hostile housing environment on the basis of race and sex restricts the tenant's ability to access building facilities, common areas, amenities, and their own

units based on those characteristics, and thus discriminates against the tenant based on those characteristics.

92.    Subjecting a tenant to a hostile housing environment on the basis of race and sex subjects the tenant to different terms or conditions in a real estate transaction based on those characteristics, as compared to tenants not subjected to a hostile housing environment based on those characteristics, and thus discriminates against the tenant based on those characteristics.

93.    A hostile housing environment that is so severe or pervasive that it forces a tenant to vacate or leave her home makes housing unavailable.

94.    Defendant's conduct, as described herein, created a hostile housing environment, which constitutes:

      a.    A denial of housing or making housing unavailable because of race and sex, in violation of Section 804(a) of the FHA, 42 U.S.C. § 3604(a); and

      b.    Discrimination in the terms, conditions, or privileges of the rental of dwellings, or in the provision of services or facilities in connection therewith, because of race and sex, in violation of Section 804(b) of the FHA, 42 U.S.C. § 3604(b).

95.    Intervenor-Plaintiffs have been injured by the discriminatory conduct of Defendant UDR. Intervenor-Plaintiffs are "aggrieved persons" as defined in 42 U.S.C. § 3602(i) and have suffered damages because of Defendant's conduct.

96.    Defendant's actions were willful and/or taken in reckless disregard for the civil rights of Intervenor-Plaintiffs.

## COUNT II
## Fair Housing Act (42 U.S.C. § 3617)

97.    Paragraphs 1 through 84 are realleged and incorporated by reference.

98.    It is "unlawful to . . . interfere with any person . . . in the exercise or enjoyment of, any right granted or protected by section [3604]."

99.    Subjecting a tenant to a hostile housing environment based on their race and sex interferes with their exercise and enjoyment of their housing rights.

100.    UDR subjected Intervenor-Plaintiffs to a hostile housing environment because of their race and sex in violation of Intervenor-Plaintiffs' rights under the Fair Housing Act, and UDR therefore unlawfully interfered with Intervenor-Plaintiffs' right to use and enjoy their homes on the basis of their race and sex.

**COUNT III**
**District of Columbia Human Rights Act (D.C. Code § 2-1402.21)**

101.    Paragraphs 1 through 84 are realleged and incorporated by reference.

102.    A hostile housing environment exists when an individual is subjected to unwelcome conduct based on a protected trait which is sufficiently severe or pervasive as to interfere with the use or enjoyment of a dwelling.

103.    Subjecting a tenant to a hostile housing environment on the basis of race and sex restricts the tenant's ability to access building facilities, common areas, amenities, and their own units based on those characteristics, and thus discriminates against the tenant based on those characteristics.

104.    Subjecting a tenant to a hostile housing environment on the basis of race and sex includes a refusal to provide the tenant services required for the tenant's safety based on those characteristics, and thus discriminates against the tenant based on those characteristics.

105.    Subjecting a tenant to a hostile housing environment on the basis of race and sex subjects the tenant to different terms or conditions in a real estate transaction based on those

characteristics, as compared to tenants not subjected to a hostile housing environment based on those characteristics, and thus discriminates against the tenant based on those characteristics.

106.    A hostile housing environment that is so severe or pervasive that it forces a tenant to vacate or leave her home makes housing unavailable.

107.    Defendant's conduct, as described herein, created a hostile housing environment, which constitutes:

    a.  An interruption of or termination of a rental or a requirement of different terms in violation of D.C. Code § 2–1402.21(a)(1);

    b.  A refusal or restriction of services in violation of D.C. Code § 2–1402.21(a)(4); and

    c.  An inclusion in the terms or conditions of a transaction in real property, any clause, condition or restriction in violation of D.C. Code § 2–1402.21(a)(2).

108.    Intervenor-Plaintiffs have been injured by the discriminatory conduct of Defendant UDR and have suffered damages because of Defendant's conduct.

109.    Defendant's actions were willful and/or taken in reckless disregard for the civil rights of Intervenor-Plaintiffs.

## COUNT IV
### District of Columbia Human Rights Act (D.C. Code § 2-1402.61)

110.    Paragraphs 1 through 84 are realleged and incorporated by reference.

111.    D.C. Code § 2–1402.61 makes it unlawful to "interfere with any person in the exercise or enjoyment of … any right granted or protected under this chapter."

112.    The rights that D.C. Code § 2–1402.61 shields from interference include the rights guaranteed by D.C. Code § 2–1402.21(a).

17

113.    Subjecting a tenant to a hostile housing environment based on their race and sex interferes with their exercise and enjoyment of their housing rights.

114.    UDR subjected Intervenor-Plaintiffs to a hostile housing environment because of their race and sex in violation of Intervenor-Plaintiffs' rights under the D.C. Human Rights Act, and UDR therefore unlawfully interfered with Intervenor-Plaintiffs' right to use and enjoy their homes on the basis of their race and sex.

## PRAYER FOR RELIEF

WHEREFORE, Intervenor-Plaintiffs respectfully pray that the Court grant the following relief:

1) enter a declaratory judgment finding that the foregoing actions of Defendants violate the District of Columbia Human Rights Act, D.C. Code § 2-1402.21 *et seq.* and the Fair Housing Act of 1968, as amended, 42 U.S.C. §§ 3601 *et seq.*;

2) enter a permanent injunction directing Defendants and their agents and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

3) award compensatory damages to Intervenor-Plaintiffs in an amount to be determined by a jury that would fully compensate them for all damages that have been caused by the conduct of Defendants alleged herein;

4) award punitive damages to Intervenor-Plaintiffs in an amount to be determined by a jury that would punish Defendant UDR for the conduct alleged herein and that would effectively deter similar conduct in the future;

5) award Intervenor-Plaintiffs their reasonable attorneys' fees and costs; and

6) order such other relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Intervenor-Plaintiffs demand a trial by jury on all issues.

Dated: April 1, 2024

/s/ *Lila Miller*
Lila Miller [1643721]
Sara Pratt [177167]
David DePriest [90019251]
RELMAN COLFAX PLLC
1225 19th Street N.W., Suite 600
Washington, D.C. 20036
(202) 728-1888
lmiller@relmanlaw.com
spratt@relmanlaw.com
ddepriest@relmanlaw.com

# Attachment 1 - Excerpts of Lease

Rent, the amount of the charge, tax or fee imposed upon us, as a result of your occupancy. As examples, these charges can include, but are not limited to: any charges we receive for any zoning violation, sound, noise or litter charge; any charge under any nuisance or chronic nuisance type statute, 911 or other life safety, per person, or per unit charge or tax and any utility bill unpaid by you, which is then assessed to us for payment.

## While You're Living in the Apartment

**15. COMMUNITY POLICIES OR RULES.** You, any occupants, and your guests and visitors shall comply with any and all written apartment rules and community policies, including instructions for care of our property, which may be attached to this Lease Contract as a written addendum. We reserve the right to change any written apartment rules and community policies at any time, and such amendments shall become effective and binding hereunder, as of the date the owner has sent a copy of them to you via first class mail. You, any occupants, and your guests and visitors shall comply with any amended apartment rules and community policies at all times after mailing, as set forth above. Any violation of any written apartment rules and community policies (or amendments thereof or thereto) shall be a violation of this Lease Contract and such apartment rules and community policies are incorporated herein, by reference.

**16. LIMITATIONS ON CONDUCT.** The apartment and other areas reserved for your private use must be kept clean by you. Trash must be disposed of by you at least weekly in appropriate receptacles in accordance with local ordinances. Passageways may be used by you only for entry or exit. Any swimming pools, saunas, spas, tanning beds, exercise rooms, storerooms, laundry rooms, and similar areas (if any of the foregoing exist in the apartment community) must be used by you with care in accordance with apartment rules and posted signs. Your access to amenities, such as swimming pools, exercise or meeting rooms, saunas, spas, tanning beds, storerooms, laundry rooms, or the like is not as a matter of right and may be terminated by us, should you fail to comply with applicable rules and regulations governing the same, or in the event that there is loud, boisterous, objectionable, or damaging behavior/occurrence(s) by you, your occupants, your guests or visitors, in or to such amenities. Glass containers are prohibited in or near pools and all common areas. You, your occupants, guests or visitors may not anywhere in the apartment community: use candles or use kerosene lamps; cook on balconies or anywhere outside of the Apartment; or solicit business or contributions. Conducting any kind of business (including child care services) in your Apartment or in the apartment community is prohibited-except that any lawful and properly licensed business conducted "at home" by computer, mail, or telephone is permissible if customers, clients, patients, or other business associates do not come to your Apartment for business purposes. We may regulate: (1) the use of patios, balconies, and porches; (2) the conduct of furniture movers and delivery persons; and (3) recreational activities in common areas.

We may exclude from the apartment community guests, visitors or others who, in our judgment, have been violating the law, violating this Lease Contract or any apartment rules and community policies, or disturbing other tenants, neighbors, visitors, or owner representatives. If any on-site management personnel or security personnel is provided by us to the apartment community, it is for the benefit us only, and is not a part of nor an amenity appurtenant to your tenancy interest hereunder. We're not responsible for obtaining criminal-history checks on any tenants, occupants, guests, visitors, or contractors in the apartment community. If you or any occupant, visitor or guest is affected by a crime, you must make a written report to our representative and to the appropriate local law-enforcement agency. You also must furnish us with the law-enforcement agency's incident report number upon request.

**17. PROHIBITED CONDUCT.** You and your occupants, guests or visitors may not engage in the following activities: behaving in a loud or obnoxious manner; disturbing or threatening the rights, comfort, health, safety, or convenience of others (including our agents and employees) in or near the apartment community; disrupting our business operations; manufacturing, delivering, possessing with intent to deliver, or otherwise possessing a controlled substance or drug paraphernalia; engaging in or threatening violence; possessing a weapon prohibited by state law; possessing any firearm whether or not in compliance with all laws and regulations; discharging a firearm in the Apartment or apartment community; displaying or possessing a gun, knife, or other weapon in the Apartment or common area; storing anything in closets having gas appliances; tampering with utilities or telecommunications; or bringing hazardous materials into the apartment community.

**18. PARKING.** Parking *[check one]* ☒ is ☐ is not provided to you under this Lease Contract. If parking is provided, we may regulate the time, manner, and place of parking all cars, trucks, motorcycles, bicycles, boats, trailers, and recreational vehicles. We may charge a fee for any such parking, under a month-to-month commercial license separate from this Lease Contract, and may terminate your license to park upon providing you with thirty (30) days' written notice. Your obligations under this Lease Contract will not be amended or modified in any way in the event we terminate parking. Any termination of a parking license may be with, or without, cause and at our sole discretion. Any parking provided hereunder shall be deemed a commercial tenancy, not appurtenant to, nor a part of your residential tenancy under this Lease Contract. Motorcycles or motorized bikes shall not be parked inside an apartment unit or on sidewalks, under stairwells, or in handicapped parking areas. We may have unauthorized or illegally parked vehicles towed. A vehicle is unauthorized or illegally parked in the apartment community if it:

(1) has a flat tire or other condition rendering it inoperable; or
(2) is on jacks, blocks or has wheel(s) missing; or
(3) has no current license or no current inspection sticker; or
(4) takes up more than one parking space; or
(5) belongs to a tenant or occupant who has surrendered or abandoned the apartment; or
(6) is parked in a marked handicap space without the legally required handicap insignia; or
(7) is parked in space marked for manager, staff, or guest at the office; or
(8) blocks another vehicle from exiting; or
(9) is parked in a fire lane or designated "no parking" area; or
(10) is parked in a space marked for other tenant(s) or unit(s); or
(11) is parked on the grass, sidewalk, or patio; or
(12) blocks garbage trucks from access to a dumpster; or
(13) belongs to a tenant or occupant and is parked in a visitor or retail parking space.

**19. NO RELEASE OF TENANT/HEIRS & ASSIGNS.** Unless you're otherwise entitled to terminate your tenancy as a matter of law, or by an express provision herein, you won't be released from this Lease Contract for any reason-including but not limited to voluntary or involuntary school withdrawal or transfer, voluntary or involuntary job transfer, marriage, separation, divorce, reconciliation, loss of Co-Tenants, loss of employment, bad health, or death. This Lease Contract inures only to the benefit of the named Tenants in Section 1 of this Lease Contract. In the event that the Tenant(s) listed herein should die at any time during the tenancy, there is no right of survivorship, inheritance, or assignment of this Lease Contract or the Apartment. In the event that the named Tenant(s) dies, all occupants must immediately vacate the Apartment. The tenant(s) hereunder hereby direct their personal representative and estate to promptly pay all unpaid rents or other financial obligations due hereunder to us, and to vacate and surrender the Apartment to the us within thirty (30) days after the Tenant(s) date of death, or in such time as is provided by a Court of competent jurisdiction in a probate or similar proceeding.

**20. MILITARY PERSONNEL CLAUSE.** All parties to this Lease Contract agree to comply with any federal law, including, but not limited to the Service Member's Civil Relief Act, or any applicable state law(s), if you are seeking to terminate this Lease Contract and/or subsequent renewals and/or Lease Contract extensions under the rights granted by such laws.

**21. TENANT DUE CARE AND PROPERTY LOSS.** You and all occupants, guests and visitors must exercise due care for you own and others' safety, especially in the use of smoke detectors, keyed deadbolt locks, keyless bolting devices, window latches, and access control devices. You acknowledge and agree that living in an urban environment, such as Washington, D.C., has risks and dangers that are beyond our control. We cannot be, and are not responsible, legally nor otherwise to protect you from these risks and dangers, unless otherwise compelled to do so under law, and you agree to assume all such risks and dangers as part of your tenancy.

## CRIME/DRUG FREE HOUSING ADDENDUM



**1. DWELLING UNIT DESCRIPTION.**
Unit. No. _____502C_____, _907 6th_
_Street SW #502C_
_____ (street address) in
Washington, D.C., _____20024_____
(zip code).

**2. LEASE CONTRACT DESCRIPTION.**
Lease Contract date: _August 3, 2021_
Owner's name: _Waterside Trust_
_____
_____
_____
_____

Tenants (list all tenants):
[redacted]
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**3. ADDENDUM APPLICABILITY.** In the event any provision in this Addendum is inconsistent with any provision(s) contained in other portions of, or attachments to, the above-mentioned Lease Contract, then the provisions of this Addendum shall control. For purposes of this Addendum, the term "Premises" shall include the dwelling unit, all common areas, all other dwelling units on the property or any common areas or other dwelling units on or about other property owned or managed by the Owner. The parties hereby amend and supplement the Lease Contract as follows:

**4. CRIME/DRUG FREE HOUSING.** Tenant, members of the Tenant's household, Tenant's guests, and all other persons affiliated with the Tenant:

A. Shall not engage in any illegal or criminal activity on or about the premises. The phrase, "illegal or criminal activity" shall include, but is not limited to, the following:

1. Engaging in any act intended to facilitate any type of criminal activity.

2. Permitting the Premises to be used for, or facilitating any type of criminal activity or drug related activity, regardless of whether the individual engaging in such activity is a member of the household, or a guest.

3. The unlawful manufacturing, selling, using, storing, keeping, purchasing or giving of an illegal or controlled substance or paraphernalia as defined in city, county, state or federal laws, including but not limited to the District of Columbia and/or the Federal Controlled Substances Act.

4. Violation of any federal drug laws governing the use, possession, sale, manufacturing and distribution of marijuana, regardless of state or local laws. (So long as the use, possession, sale, manufacturing and distribution of marijuana remains a violation of federal law, violation of any such federal law shall constitute a material violation of this rental agreement.)

5. Engaging in, or allowing, any behavior that is associated with drug activity, including but not limited to having excessive vehicle or foot traffic associated with his or her unit.

6. Any breach of the Lease Contract that otherwise jeopardizes the health, safety, and welfare of the Owner, Owner's agents, or other Tenants, or involving imminent, actual or substantial property damage.

7. Engaging in or committing any act that would be a violation of the Owner's screening criteria for criminal conduct or which would have provided Owner with a basis for denying Tenant's application due to criminal conduct.

8. Engaging in any activity that constitutes waste, nuisance, or unlawful use.

B. AGREE THAT ANY VIOLATION OF THE ABOVE PROVISIONS CONSTITUTES A MATERIAL VIOLATION OF THE PARTIES' LEASE CONTRACT AND GOOD CAUSE FOR TERMINATION OF TENANCY. A single violation of any of the provisions of this Addendum shall be deemed a serious violation, and a material default, of the parties' Lease Contract. It is understood that a single violation shall be good cause for taking action to terminate the Lease Contract. In addition to the foregoing, Owner may terminate Tenant's tenancy for any other lawful reason, and by any lawful method.

**5. CRIMINAL CONVICTION NOT REQUIRED.** Unless otherwise required by law, proof of violation of any criminal law shall not require a criminal conviction.

**6. SPECIAL PROVISIONS.** The following special provisions control over conflicting provisions of this printed form:
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Tenant or Tenants (sign here)
[signature]
9C93FFF01D5C44C...

Date of Signing Addendum
8/3/2021
8/7/2021

Owner or Owner's Representative (signs here)
[signature]
Megan

Date of Signing Addendum
AUG 1 0 2021

© 2018, National Apartment Association, Inc. - 9/2018, Washington, D.C.